1  **WO**

2

3

4

5

6              **IN THE UNITED STATES DISTRICT COURT**

7                **FOR THE DISTRICT OF ARIZONA**

8

9   Kevin Barnes,                              No. CV-19-00396-TUC-JGZ

10                Plaintiff,                    **ORDER**

11   v.

12   Steven Mingura, et al.,

13                Defendants.

14

15         Plaintiff Kevin Barnes, who is represented by counsel, brought this civil rights case

16  pursuant to 42 U.S.C. § 1983. (Doc. 11.) Defendants Steven Mingura and Sheriff Preston

17  Allred move for summary judgment. (Docs. 95, 92.) The motions are fully briefed.[1] (Docs.

18  103, 123, 127, 129.) For the following reasons, the Court will deny Mingura's Motion, and

19  deny Allred's Motion in part and grant it in part.

20                        **BACKGROUND**

21         In his First Amended Complaint, Barnes brings claims against Graham County

22  Sheriff Preston Allred and former Deputy Steven Mingura for violations of his Fourth and

23  Fourteenth Amendment rights. (Doc. 11.) In Count One, Barnes alleges that Mingura

24  intentionally used unnecessary and excessive force when arresting him on November 16,

25  2017. (*Id.* ¶ 16.) In Count Two, Barnes alleges that Sheriff Allred violated his constitutional

26  rights under a *Monell* theory based on deficiencies in the hiring, retention, training,

27

28  ―――――――――――――
[1] Oral argument was not held as it would not aid the Court's decisional process. *See Partridge v. Reich*, 141 F.3d 920, 926 (9th Cir. 1998); LRCiv 7.2(f).

1  supervision, and discipline of Mingura. (*Id.* ¶ 19–25; *see Monell v. Dep't of Soc. Servs. of*
2  *New York*, 436 U.S. 658 (1978).)

3        In their motions for summary judgment, Defendants argue that Barnes' claims are
4  barred by *Heck v. Humphrey*, Mingura's force was reasonable, Mingura is entitled to
5  qualified immunity, and Allred is not liable in his official capacity. (Docs. 92, 95; *see Heck*
6  *v. Humphrey*, 512 U.S. 477 (1994).)

7                          **SUMMARY JUDGMENT STANDARD**

8        A court must grant summary judgment "if the movant shows that there is no genuine
9  dispute as to any material fact and the movant is entitled to judgment as a matter of law."
10 Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The
11 movant bears the initial responsibility of presenting the basis for its motion and identifying
12 those portions of the record that it believes demonstrate the absence of a genuine issue of
13 material fact. *Celotex*, 477 U.S. at 323.

14       If the movant fails to carry its initial burden of production, the nonmovant need not
15 produce anything. *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Co., Inc.*, 210 F.3d 1099,
16 1102–03 (9th Cir. 2000). But if the movant meets its initial responsibility, the burden shifts
17 to the nonmovant to demonstrate the existence of a material factual dispute, and that the
18 dispute is genuine, that is, the evidence is such that a reasonable jury could return a verdict
19 for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 250 (1986); *see*
20 *Triton Energy Corp. v. Square D. Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995). The nonmovant
21 need not establish a material issue of fact conclusively in its favor. *First Nat'l Bank of Ariz.*
22 *v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968). However, it must "come forward with
23 specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co.,*
24 *Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal citation omitted); *see* Fed.
25 R. Civ. P. 56(c)(1).

26       At summary judgment, the court's function is not to weigh the evidence and
27 determine the truth but to determine whether there is a genuine issue for trial. *Anderson*,
28 477 U.S. at 249. In its analysis, the court must believe the nonmovant's evidence and draw

all inferences in the nonmovant's favor. *Id.* at 255. The court need consider only the cited materials, but it may consider any other materials in the record. Fed. R. Civ. P. 56(c)(3).

FACTS

### I.   November 16, 2017 Incident

On November 16, 2017, Barnes' spouse called 911 to report that Barnes was being verbally aggressive and throwing things. (Doc. 96 ¶ 12.)[2] Graham County Sheriff's deputies responded to the Barnes residence, but Barnes was not there. (*Id.* ¶ 13.) Shortly after the deputies left, Barnes returned to the residence and his spouse again called 911. (*Id.* ¶ 14.) The deputies responded once again; Deputy Schysm, who is not a party to this action, was the first to arrive. (*Id.* ¶ 15.) When Deputy Schysm entered the residence, Barnes was sitting in a lounge chair; his spouse and their two minor children were also present. (*Id.* ¶ 16.)

Mingura was parked within a few miles of the Barnes residence when he heard the dispatch for deputies to respond. (Doc. 104 ¶ 74.) He called his supervising sergeant and told him that he would "try to stay out of this one," but drove out to the area "because 'he knew how Kevin is.'"[3] (*Id.* ¶¶ 30, 73; Doc. 104-7 at 60.) Ultimately, Mingura went to the

---

[2] The Court cites to Mingura's Statement of Facts (Doc. 96) and Sheriff Allred's Statement of Facts (Doc. 93) where the facts are undisputed. Defendants did not object to or dispute the additional facts provided with Barnes' Controverting Statements of Fact, which the Court incorporates. (Docs. 104, 126; *see* Doc. 123 at 16–19 (objecting only to improper argument and imprecise pin cites in controverting statement of facts).) Additionally, Defendants have provided the body camera footage from the November 16 arrest. (*See* DVD, Exs. 2–4, 8–11.) To the extent that the parties' facts conflict with the videos, the Court will consider the evidence as depicted by the body camera footage. *See Scott v. Harris*, 550 U.S. 372, 380-81 (2007) (a court may properly consider video evidence in ruling on a motion for summary judgment and should view the facts "in the light depicted by the videotape.").

[3] The November 16, 2017 incident was not Mingura's first time meeting Kevin Barnes. Barnes' complaint alleges that on November 3, 2017, Mingura forcibly threw Barnes to the ground face first, handcuffed him, turned him over, and punched him hard in the face three times without any justification. (Doc. 73 at 5–6 (citing Doc. 11 ¶ 13).) On August 3, 2018, Barnes filed a lawsuit in Graham County Superior Court, CV 2018-00081, naming Mingura and Sheriff Allred as defendants and asserting claims arising out of Barnes' interactions with Mingura on November 3 and November 16, 2017. (Doc. 73 at 2.) The parties to that action subsequently entered into a settlement agreement  resolving the November 3 claims only. (*Id.*) The settlement agreement expressly reserved the right for

Barnes residence and waited outside on the front patio next to the open door; non-party Deputies Haralson and Martin arrived and went inside the home. (Doc. 96 ¶¶ 17, 18.) The three deputies inside spoke with Barnes, and one asked, "Kevin, you wanna stand up for me?" (DVD, Ex. 3 2:19–2:22.) Video of the interaction shows Barnes refused. A deputy stated, "Yes, you're under arrest." (*Id.*) Barnes responded, "No, I'm not." (*Id.*) Two deputies physically brought Barnes to his feet, holding on to Barnes' left arm and the back of his neck. [4] (*Id.* 2:22–2:27.)

Mingura entered the home as soon as Barnes was told that he was under arrest, and walked around and in front of Barnes so that he was standing face-to-face with Barnes as the other deputies stood him up. (Doc. 104 ¶ 75; DVD, Ex. 3 2:22–2:30.) The three deputies were holding Barnes from behind and the side. (Doc. 96 ¶ 30; Doc. 104 ¶ 33.) The parties dispute whether Barnes resisted at this point,[5] but the video shows that Mingura grasped Barnes' t-shirt near the shoulder with his left hand, and wrapped his right arm around Barnes' neck. (Doc. 104 ¶ 77; DVD, Ex. 4 4:49–4:54) Barnes responded, "get your hand off me," and grasped Mingura's left arm with his right hand. (Doc. 96 ¶ 33; DVD, Ex. 3 2:36–2:38.) As soon as Barnes touched Mingura's arm, Mingura initiated a "takedown"

---

Barnes to sue Sheriff Allred and Mingura in connection with the November 16 incident. (*Id.*) In this action, Defendants have asserted counterclaims for breach of contract and unjust enrichment, alleging that Barnes' complaint violated the prior settlement agreement by referencing the November 3 incident. (Doc. 12 at 9–11, ¶¶ 17–29; Doc. 14 at 9–10, ¶¶ 17–29.) The Court has denied summary judgment on the counterclaims and concluded that a genuine issue of material fact exists as to whether the 2019 settlement agreement precludes Barnes from using evidence of the November 3 incident to prove his *Monell* claim against Allred and punitive damages claim against Mingura relating to the November 16 incident. (Docs. 73 at 2, 132 at 1.)

[4] The parties dispute whether Barnes physically resisted the deputies' attempt to stand him up. Barnes later pleaded guilty to passively resisting arrest and maintains that his only resistance was the refusal to stand up when instructed. (Doc. 104 ¶ 27.)

[5] Defendants assert that Barnes was resisting and pulling his hands away from the deputies at this time, and that he "lunged" at Mingura. (Doc. 96 ¶¶ 28, 31.) Barnes disputes these allegations, and the video does not show him pulling his hands away, physically resisting the deputies, or lunging at Mingura. (Doc. 104 ¶¶ 28, 31; DVD, Ex. 3 2:22–2:30, Ex. 4 4:35–4:56.) At this same time, Barnes' daughter stepped toward Barnes and pointed at Mingura, saying "No," before she was pushed away. (DVD, Ex. 3 2:28–2:32.)

and brought Barnes down to the floor. (Doc. 96 ¶ 34; Doc. 104 ¶¶ 34, 79; DVD, Ex. 3 2:39–2:41.) As he came down, Barnes let go of Mingura's wrist and attempted to use his right arm to break his fall. (Doc. 104 ¶¶ 37, 80.) Barnes landed on his stomach with his face close to a metal ventilation grate on the floor. (Doc. 96 ¶ 34; DVD, Ex. 2 9:44–9:46.) The video shows that Barnes' right arm was flat on the floor, near Mingura's legs, as Mingura shifted his weight over Barnes and pushed him into the floor. (DVD, Ex. 3 2:45–2:47.) Meanwhile, Barnes' daughter continued to attempt to interfere with the arrest, encouraging the Barnes family dog to "go get" and "sic" the officers. (Doc. 96 ¶¶ 35, 39.)[6] Deputy Martin disengaged with Barnes to move the daughter away and restrain her. (Doc. 96 ¶ 40.)

On the floor, Mingura, Deputy Schysm, and Deputy Haralson surrounded Barnes. (Doc. 96 ¶ 36; DVD, Ex. 2 9:45–10:10.)[7] Deputy Schysm had control of Barnes' left arm, while Mingura was positioned over Barnes' upper body and delivered one closed-fist strike to Barnes' head. (DVD, Ex. 2 9:45–9:49.) Mingura pressed Barnes' face to the floor over the grate, then stated in a normal volume, "he tried grabbing my balls." (*Id.* 9:51–9:53.)[8]

---

[6] The dog did not respond to the daughter's directives and did not act aggressively towards the officers at any time. Mingura's body camera footage shows that the dog was sitting on a couch on the front porch when Mingura arrived at the Barnes residence; Mingura did not interact with the dog. (DVD, Ex. 4 2:00–2:40) Deputy Haralson's body camera footage shows that the dog was on the porch near Mingura when Haralson arrived. (DVD, Ex. 3 0:28–0:40.) The dog wagged its tail as Haralson approached. (*Id.*) Haralson quietly said, "what's up dog," and the dog climbed down from the couch and approached Haralson with a submissive demeanor and wagging tail. (*Id.*) The dog followed Haralson into the home; Haralson said, "I don't got no steaks on me," as the dog sniffed him, and Haralson bent down to pat the dog. (*Id.* 0:40–0:58.) During the arrest, the video shows the dog sitting on the couch in the living room—it did not move or bark during the altercation, even as Barnes' daughter continued to yell or when she was restrained by two deputies on the floor immediately next to the dog. (*Id.* 3:14–3:19.) Defendants do not allege that the dog posed a danger or interfered with the arrest.

[7] Barnes disputes the Defendants' characterization that he "wrestled" or struggled against the deputies' effort to bring his hands behind back, and disputes that there was any need to stop his upper body from moving because the three deputies were controlling his movement with the weight of their bodies. (Doc. 104 ¶¶ 36–42.)

[8] Defendants assert that the "video evidence demonstrates that Plaintiff grabbed and squeezed Deputy Mingura's testicles, causing him immense pain." (Doc 96 ¶ 7.) The body camera footage does not show this; Barnes' right arm is not visible except for the moment

Mingura asserts that he delivered the fist strike after Barnes failed to obey commands and "to make Plaintiff let go of his testicles." (Doc. 96 ¶ 7.) The body camera footage shows that Mingura struck Barnes in the head before he said that Barnes had tried to grab his testicles, and before he said, "let go". (DVD, Ex. 2 9:45–9:56.)

After delivering the fist strike, and with his knee on Barnes' back, Mingura lifted up Barnes' head with two hands and hit it against the metal floor grate three times in rapid succession. (*Id.* 9:53–9:56.)[9] Mingura and the other deputies then pulled Barnes' right arm back behind his back, while Mingura said, "don't *ever* grab my balls, Kevin." (*Id.* 9:59–10:06.) Barnes' hands were fully restrained in the next five to six seconds; Mingura's knee remained on Barnes' back. (*Id.* 10:04–10:10.) Approximately one minute and 51 seconds elapsed between the time that Barnes was told he was under arrest and when the deputies picked him up off the floor in handcuffs. (DVD, Ex. 3 2:22–4:13.) Mingura's use of force fractured several bones in Barnes' face, including his orbital eye-socket, maxilla, nasal bone, and nasal septum. (Doc. 104 ¶ 48.)[10]

In 2018 in Graham County Superior Court, Barnes pleaded guilty to disorderly conduct, passively resisting arrest, and assault, in violation of A.R.S. §§ 13-2904, 13-2508, 13-1203(A)(3), for his conduct on November 16, 2017.[11] (Doc. 96 ¶ 64.) At the

---

it is shown flat on the floor near Mingura's legs. (DVD, Ex. 3 2:45–2:47.) Barnes asserts that Mingura's statements on the video demonstrate that Barnes did not in fact touch Mingura's testicles because Mingura said only, "he *tried*," and his voice was "calm and subdued," even when he said, "let go."  (Doc. 104 ¶ 48.) Barnes denies that he ever attempted to touch Mingura's testicles. Because the video does not clearly show Barnes' right hand, it remains disputed whether Barnes did so.

[9] Mingura asserts that he forced Barnes' head to the floor repeatedly to "try and stop" Barnes' upper body from moving. (Doc. 96 ¶ 42.) Barnes disputes that there was any need to slam his head on the floor because the three deputies were controlling him with the weight of their bodies, preventing him from moving his upper body. (Doc. 104 ¶ 42.) Barnes asserts that if he appears to be struggling in the video, it is only because he was "writhing in pain." (*Id.* ¶¶ 55, 61.)

[10] Barnes does not claim injury to his back from the placement of Mingura's knee. (Doc. 104 ¶ 57.)

[11] Under A.R.S. § 13-2508(A)(3), a person commits resisting arrest by "intentionally preventing or attempting to prevent a person reasonably known to him to be a peace officer,

change of plea hearing, Barnes' attorney provided the factual basis for the resisting arrest and assault charges as follows:

> When the police arrived, the body camera shows that Mr. Barnes was seated in a recliner or an armchair. They asked him repeatedly to stand up—he refused to do so. An officer placed his hand on the back of Mr. Barnes' neck and lifted and shoved him forward in order to get him to his feet. And we believe that that forms the factual basis for resisting arrest by passive resistance.
>
> . . .
>
> After he was on his feet, Officer Mingura placed his left hand on the right shoulder of Mr. Barnes as is clearly shown in the videotape. Mr. Barnes as clearly shown said get your hands off me and he grabbed Officer Mingura by the wrist and tried to move Officer Mingura's arm off of him and they actually afterwards fell to the floor would be the basis for assault, class one misdemeanor.

(*Id.* ¶ 65.) The disorderly conduct conviction arose out of conduct prior to the deputies' arrival at the Barnes residence: Barnes had thrown a glass bottle at his spouse. (Doc. 96 ¶ 19.) Barnes agreed that the factual basis for each conviction was true. (*Id.* ¶ 67.)

## II.   Defendant Mingura's Hiring, Training, Discipline, and Retention

Mingura applied in September 2014 to be a deputy at the Graham County Sheriff's Office. (Doc. 93 ¶ 9.) He completed an employment application that included his prior history of working for other law enforcement agencies, including his time at the Greenlee County Sheriff's Office, Town of Clifton Police Department, and Town of Pima Police Department. (*Id.*) Prior to hiring, Mingura also submitted to a background check, polygraph examination, and completed an Arizona Peace Officers Standards and Training Board (AZPOST) Personal History form, which disclosed that he had been "cited, arrested, accused or charged with a crime," regarding past use of excessive force. (*Id.*; Doc. 126 ¶

---

acting under color of such peace officer's official authority, from effecting an arrest" by engaging in passive resistance. Passive resistance, a class one misdemeanor, means "a nonviolent physical act or failure to act that is intended to impede, hinder or delay the effecting of an arrest." A.R.S. § 13-2508(A)(3)(C). Under A.R.S. § 13-1203(A)(3), a person commits assault, a class three misdemeanor, by "knowingly touching another person with the intent to injure, insult, or provoke such a person."

10.) Graham County Undersheriff Carl McCormies, or Chief McCormies, is second in command at the Graham County Sheriff's Office and his responsibilities include overseeing hiring, internal investigations, and training. (Doc. 93 ¶¶ 5, 6.) Lieutenant Jerry Nelson gathered the background information and completed the AZPOST Peace Officer Standards for Appointment checklist on Mingura. (*Id.* ¶ 11.) In his polygraph examination, Mingura disclosed that his prior employer, the Clifton Police Chief, had requested the Arizona Department of Public Safety (DPS) to investigate allegations that Mingura had used excessive force against arrestees. (Doc. 126 ¶ 31.) Neither Chief McCormies nor Lieutenant Nelson contacted DPS to obtain or review the 88-page report it prepared in 2012. (Doc. 126 ¶ 10; *see* Doc. 126-1 at 2–89.)

The 2012 DPS report investigated Mingura's alleged use of excessive force against five separate individuals during arrests, and documented Mingura's uses of force against several other unnamed individuals. (Doc. 126-1 at 3, 11, 23, 44, 69.)[12] In one instance, Mingura's fellow deputies reported that, after they had arrested and secured an individual, Mingura arrived on the scene with a shotgun in his hands, then "racked a round into the chamber of the shotgun and told the suspect, 'move and I'll send you to hell mother fucker.'" (Doc. 126 ¶ 37 (quoting 126-1 at 88).)

Despite Mingura's disclosure, in both his personal history form and polygraph examination, that he had been charged with a crime involving excessive force, neither

---

[12] At the time of the investigation, the compliance officer at AZPOST was well aware of Mingura's reputation for using excessive force. (Doc. 126 ¶ 31.) The detective conducting the DPS investigation called Compliance Officer Orfe on November 7, 2011 to explain that he was criminally investigating an officer at the Clifton Police Department. (*Id.*) Before the detective could provide a name, Officer Orfe asked which one of the Mingura brothers he was investigating, explaining that Steven Mingura and his brother had reputations of being "heavy handed" in making arrests. (*Id.* ¶ 31 (quoting Doc. 126-1 at 77).) Officers who worked with Mingura also expressed concerns about being "on a scene" with him and reported that he was "heavy handed," was "someone who antagonizes people, talks down to people, has the ability just by his presence to escalate a situation," and would not "trust him to stop one of their family members." (*Id.* ¶ 32 (quoting Doc. 126-1 at 84–85).) Others described Mingura as an "arrogant" officer who would "purposely escalate the situation to a point where an arrest would occur," and thought "law enforcement is a competition." (*Id.*)

McCormies nor Nelson contacted the prosecutor in the 2011 criminal case to obtain information regarding the charges—three counts of felony aggravated assault involving three separate victims.[13] (Doc. 126 ¶¶ 12, 30.)

Lieutenant Nelson produced a Graham County Sheriff's Department Background Report on Mingura that outlined and summarized the background investigation; that report reflected that Mingura was "a satisfactory candidate to hire" as a Graham County Sheriff's Deputy. (Doc. 93 ¶ 12.) Mingura had completed the Central Arizona Regional Law Officers Training Academy in 2007, which trained cadets on use of force. (*Id.* ¶ 13.) Upon hiring, Mingura completed GCSO's eight- to ten-week field training program. (*Id.* ¶ 17.) Mingura testified that he did not receive training regarding use of force while employed at GCSO—he had asked Lieutenant Nelson and the use of force instructor for in-house training, but was advised that "he didn't have time this year." (Doc. 126 ¶ 13 (quoting Doc. 126-2 at 3).)

While he was employed at GCSO, written policies on use of force were in effect and Mingura was supervised by the chain of command. (Doc. 93 ¶ 20, 21.) Performance evaluations reflected that Mingura demonstrated "competent, acceptable, even commendable performance." (*Id.* ¶ 22.)

Prior to November 16, 2017, Chief McCormies was aware of Mingura's November 3, 2017 use of force against Barnes, and recognized that there was a disparity between Barnes' and Mingura's descriptions of the incident. (*Id.* ¶ 23.) Chief McCormies was in the process of obtaining the assistance of an independent outside agency to investigate the November 3 incident when Mingura responded to the Barnes residence and again used force against Barnes on November 16, 2017. (*Id.*) Mingura was placed on administrative leave with pay on December 7, 2017. (*Id.* ¶ 24.) The DPS Investigation into the November 3 incident was completed on or about October 29, 2018; it concluded that Mingura's use

---

[13] The criminal case against Mingura was ultimately dismissed due to lack of cooperation by the victims. (Doc. 126 ¶¶ 30, 61.)

of force against Barnes was unreasonable and excessive. (*Id.*) After a hearing on November 6, 2018, Mingura was terminated from GCSO due to his November 3 use of force against Barnes. (*Id.*) Mingura was not disciplined for the November 16, 2017 incident; Chief McCormies concluded that the November Bar 16 use of force was reasonable under the circumstances because "Barnes grabbed Mingura's testicles," and "was physically resisting arrest" while his daughter attempted to intervene. (*Id.* ¶ 25.) The claims in Barnes' pending lawsuit pertain to the November 16 incident.

## DISCUSSION

Defendant Mingura moves for summary judgment on Barnes' § 1983 excessive force claim, arguing that it is barred under *Heck v. Humphrey*, 512 U.S. 477 (1994), that Mingura's actions were objectively reasonable, and that he is entitled to qualified immunity. (Doc. 95 at 2.) Sheriff Allred moves for summary judgment and asserts that he is entitled to judgment as a matter of law because there is no evidence of deliberate indifference in the Graham County Sheriff's Officer's hiring, training, supervision, discipline, or retention of Mingura. (Doc. 92 at 9.)

## I.    *Heck v. Humphrey* **Does Not Bar Barnes' Excessive Force Claims**

Mingura argues that Barnes' guilty plea to resisting arrest and assault bars his excessive force claim under *Heck v. Humphrey*. The Court disagrees. Because Barnes' excessive force claim turns on conduct that was not part of the factual basis of his plea, success in this action would not necessarily invalidate his convictions. As a result, the *Heck* bar does not require dismissal of Barnes' claim that Mingura used excessive force when he struck Barnes and hit his face against the metal grate on the floor three times.

In *Heck*, the Court held that a prisoner's claim for damages cannot be brought under 42 U.S.C. § 1983 if "a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence," unless the prisoner demonstrates that the conviction or sentence has previously been reversed, expunged, or otherwise invalidated. *Heck*, 512 U.S. at 486–87. The Supreme Court has since emphasized that it was "careful in *Heck* to stress the importance of the term 'necessarily.'" *Lemos v. County of Sonoma*, 40

F.4th 1002, 1005 (9th Cir. 2022) (en banc) (quoting *Nelson v. Campbell*, 541 U.S. 637, 647 (2004)). If the prior conviction arises out of a guilty plea, the court must look to the factual basis of the plea to determine if success in the § 1983 action would necessarily invalidate the plea. *Lemos*, 40 F.4th at 1006, 1008; *see Smithart v. Towery*, 79 F.3d 951, 952 (9th Cir. 1996).

Here, Barnes' § 1983 claim is limited to Mingura's alleged excessive use of force when he struck Barnes and hit his face against the floor while placing a knee on Barnes' back. (Doc. 103 at 9.) For his conduct on November 16, 2017, Barnes pleaded guilty to passively resisting arrest, in violation of A.R.S. § 13-2508, and assault, in violation of A.R.S. § 13-1203(A)(3). The factual basis of the passive resistance plea was limited to Barnes' refusal to stand up out of his chair. As his attorney explained, the deputies "asked him repeatedly to stand up—he refused to do so." (Doc. 96 ¶ 65.) Crucially, Barnes did not admit to, and was not convicted of, physically resisting the deputies by struggling against their attempts to handcuff him or wrestling with them on the floor—his passive resistance ended when the deputies stood him up. Similarly, as Barnes' attorney explained, Barnes' assault plea was based solely on conduct occurring prior to Barnes' being taken to the floor: "Barnes as clearly shown said get your hands off me and he grabbed Officer Mingura by the wrist and tried to move Officer Mingura's arm off of him and they actually afterwards fell to the floor would be the basis for assault."[14] (*Id.*)

Barnes' prior guilty pleas pertained only to his actions up until he was on the floor, while his excessive force claim is limited to Mingura's use of force against Barnes after he was pinned on the floor. Barnes does not contest the facts underlying his plea and neither his passive resistance nor his admitted assault on Mingura was the moving force behind the alleged constitutional violation. Thus, success in this action would not in any way invalidate Barnes' prior resisting arrest or assault convictions.

---

[14] While both parties agree that Mingura took Barnes to the floor and the men did not accidentally fall, Barnes does not allege that the takedown was excessive or seek damages for that use of force.

Mingura argues that Barnes' convictions should bar any excessive force claim against him for "any actions" Mingura took in the November 16 encounter because "an arrest under the Fourth Amendment extends from the start to the end of an arrest, spanning the entire period a suspect remains with the arresting officers," and "a defendant can only be convicted of resisting arrest in Arizona if the officer's conduct was lawful." (Doc. 95 at 7–8 (citing *Curry v. Baca*, 371 F. Appx. 733, 733–34 (9th Cir. 2010).) Mingura's argument fails because both the temporal and categorical approaches to the *Heck* bar are no longer applicable; analyzing the factual basis of the conviction is required. *Lemos*, 40 F.4th at 1006, 1008.

Applying a temporal analysis, Mingura explains that Arizona courts have held that "effecting arrest" under A.R.S. § 13-2508 "is on-going beginning with the officer's first physical contact and continuing even after the arrest may be 'complete' under the law." *State v. Flores*, 260 P.3d 309, n.1 (Ariz. Ct. App. 2011) (citing *State v. Mitchell*, 62 P.3d 616, 619–20 (Ariz. Ct. App. 2003)). Mingura asserts that none of the force used "occurred pre-arrest or post-arrest," but rather during "the same phase of the encounter" and was thus not "outside the timeframe from which Plaintiff resisted arrest." (*Id.* at 9.) This argument relies on the Ninth Circuit's interpretation of a California resisting arrest statute in *Smith v. City of Hemet*, 394 F.3d 689 (9th Cir. 2005). In *Smith*, the panel identified different "phases" in an arrest encounter when considering whether the *Heck* bar applied. The Ninth Circuit subsequently narrowed *Smith*'s holding after an intervening California Supreme Court decision interpreted the statute at issue and clarified that not all encounters can be divided into discrete phases—and that both lawful and unlawful force may be used by officers during a "continuous transaction" of events. *Hooper v. County of San Diego*, 629 F.3d 1127, 1132 (9th Cir. 2011). In any event, Barnes was convicted of resisting arrest and assault in Arizona, not under the California statute.

Mingura takes a categorical approach to the Arizona statutes. He argues that Barnes' excessive force claims would necessarily invalidate his convictions because an excessively forceful arrest is unlawful in Arizona and a resisting arrest conviction requires the officer's

conduct to be lawful. (Doc. 95 at 7.) In support, Mingura cites several District of Arizona cases applying this logic to bar claims under *Heck*. These cases are inapposite because each was decided before the en banc Ninth Circuit decision in *Lemos* held that the court must look to the factual basis of the conviction, not categorically interpret the elements of the statute. *Lemos*, 40 F.4th at 1006, 1008.

Further, Mingura's characterization of the relevant Arizona statutes is incorrect. Arizona's resisting arrest statute does not require the arrest to be lawful to sustain a conviction, it merely provides that the person must reasonably know the arresting officer is "a peace officer, acting under color of such peace officer's official authority." A.R.S. § 13-2508(A). Additionally, the statutory justification defense is not part of the resisting arrest or assault statutes, it is a separate affirmative defense codified at A.R.S. § 13-404. It provides that a person is *not* justified in the threat or use of physical force against another to "resist an arrest that the person knows or should know is being made by a peace officer or by a person acting in a peace officer's presence and at his direction, *whether the arrest is lawful or unlawful*, unless the physical force used by the peace officer exceeds that allowed by law." A.R.S. § 13-404(B)(2) (emphasis added). Regardless, the court must look to the factual basis of the assault plea, not only to the text of the statute of conviction. Section 13-404 is not referenced in the plea agreement and justification was not discussed at the change of plea hearing. Barnes may have waived the justification defense, but there was no finding in the criminal record as to whether the force used by Mingura or the other deputies was excessive.

In sum, looking to the factual basis of Barnes' guilty pleas shows that Barnes was convicted only of conduct that occurred before he was on the floor, prior to Mingura's alleged use of unlawful force. Thus, the fact that he was convicted of resisting arrest and assault does not establish, as a matter of law, that the arrest was lawful or did not involve excessive force at any point during the encounter. Even if Barnes' attempt to move Mingura's hand from his shoulder constitutes physical resistance, Barnes' assault plea covers only the acts of grasping Mingura's wrist and attempting to move Mingura's arm

away. Viewing the evidence in the light most favorable to Barnes, who disputes that he struggled on the floor, once Barnes had let go of Mingura's arm, the assault had ended, regardless of whether the arrest had been fully "effected." To interpret the *Heck* bar otherwise would permit an unscrupulous officer who encounters a resisting arrestee—even one who passively resists—to prolong the arrest encounter and continue to use disproportionate force without consequence so long as the arrestee is later convicted of resisting arrest or assaulting the officer.

Accordingly, the Court finds that *Heck* does not bar Barnes' § 1983 claim alleging that Mingura used excessive force when he struck Barnes with a closed-fist and hit his head against the metal grate on the floor three times.

## II. A Reasonable Jury Could Conclude Mingura's Force was Excessive

The Fourth Amendment requires that police officers use only an amount of force that is objectively reasonable in light of the circumstances. *Tennessee v. Garner*, 471 U.S. 1, 7–8 (1985). The use of excessive force by police officers in the course of an arrest can violate the arrestee's Fourth Amendment right to be free from unreasonable seizures. *See White by White v. Pierce County*, 797 F.2d 812, 816 (9th Cir. 1986). The Fourth Amendment does not prohibit the use of reasonable force. *Tatum v. City & County of San Francisco*, 441 F.3d 1090, 1095 (9th Cir. 2006). But even if some amount of force is justified, an officer may not use more force than is reasonably necessary. *Santos v. Gates*, 287 F.3d 846, 853 (9th Cir. 2002).

To determine whether a Fourth Amendment violation has occurred, the court conducts a three-step analysis, assessing (1) the nature of force inflicted; (2) the governmental interests at stake, which involves assessing factors such as the severity of the crime, the threat posed by the suspect, and whether the suspect was resisting arrest (the "Graham factors"); and (3) whether the force used was necessary. *Espinosa v. City & County of San Francisco*, 598 F.3d 528, 537 (9th Cir. 2010) (citing *Graham v. Connor*, 490 U.S. 386, 396–97, and *Miller v. Clark County*, 340 F.3d 959, 964 (9th Cir. 2003)). The Court must balance the nature and quality of the intrusion against the countervailing

governmental interests at stake. *Graham*, 490 U.S. at 396. Moreover,

> [t]he "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. . . . "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers," violates the Fourth Amendment.

*Graham*, 490 U.S. at 396 (citations omitted). However, because this is a highly fact-intensive inquiry, "whether a particular use of force was reasonable is rarely determinable as a matter of law," and "should only be taken from the jury in rare cases." *Chew v. Gates*, 27 F.3d 1432, 1443 (9th Cir. 1994); *Green v. City of San Francisco*, 751 F.3d 1039, 1049 (9th Cir. 2014).

Here, the *Graham* analysis, as well as the consideration of whether the force was necessary, turns on several disputed facts. A key dispute is whether Barnes physically resisted arrest once on the floor. While Mingura argues that Barnes fought the deputies, Barnes contends that Mingura's "two violent uses of force" were excessive because Barnes was pinned on his stomach with three deputies around him and, instead of attempting to control Barnes' free right arm to handcuff him, Mingura "began to repeatedly smash" his face into the metal grate and punched him with enough force to fracture several bones. (Doc. 95 at 11; Doc. 103 at 20.) Viewing the evidence in the light most favorable to Barnes, as the Court must do on a motion for summary judgment, the Court concludes that a reasonable jury could find that Mingura's fist strike and face-to-floor contact was unreasonable and unnecessary.

At the first step of the excessive force analysis—the amount of force inflicted—the parties agree that Mingura delivered one closed-fist strike to Barnes' head and hit his face against the floor three times. These actions are visible on the body camera footage, which shows that Mingura struck Barnes in the head and then placed two hands on the back of Barnes' head to drive his face down onto the metal ventilation grate. The parties also do not dispute that Mingura's use of force resulted in multiple injuries to Barnes' face,

including fractures to his orbital eye-socket, maxilla, nasal bone, and nasal septum. Mingura characterizes this as an "intermediate" use of force, while Barnes contends that it was "extreme[ly] violent and severely destructive." (Doc. 95 at 11–12; Doc. 103 at 20.) A reasonable jury could conclude that the extent of the injuries inflicted by Mingura demonstrates that his force was a significant intrusion on Barnes' Fourth Amendment rights. *See Lalonde v. County of Riverside*, 204 F.3d 947, 959 (9th Cir. 2000) ("[I]f the extent of the injury to [plaintiff's] back is serious enough, a jury could conclude that [the officer] used force in excess of what was reasonable, even if [plaintiff] had been resisting at the time.").

At the second step, the Court must consider the governmental interests at stake by evaluating the *Graham* factors: the severity of the crime, whether the arrestee posed an immediate threat, and whether the arrestee was resisting. *Espinosa*, 598 F.3d at 537. As to the severity of the crime, deputies responded to the Barnes residence for a domestic violence call; Barnes had allegedly thrown a beer bottle at his spouse.[15] It has been recognized that domestic violence calls can pose some of the highest risks to officer safety. *Mattos v. Agarano*, 661 F.3d 433, 450 (9th Cir. 2011). This factor weighs in Mingura's favor.

It is disputed whether Barnes posed a threat during the arrest. The video evidence demonstrates that Barnes did not pose an immediate threat to the deputies upon their arrival—Barnes sat in his chair the entire time he conversed with the deputies until he was pulled to his feet. Barnes concedes that he passively resisted by refusing to stand up, but the video shows that Barnes did not lunge at the deputies as Mingura alleges. Barnes subsequently pleaded guilty to assault because he grasped Mingura's arm after Mingura grabbed him, a class three misdemeanor. Mingura alleges no injury from that contact. Once Barnes was on the floor, the video shows that he was surrounded by three deputies, with one controlling his left arm while Mingura placed a knee on Barnes' back and used force

---

[15] Barnes subsequently pleaded guilty to misdemeanor disorderly conduct.

on his head and face. Mingura asserts that during this time Barnes "violently resisted arrest" because he struggled and grabbed Mingura's testicles. (Doc. 95 at 11.) Barnes denies ever touching Mingura's testicles. This factual dispute is not resolved by the video because it does not clearly show Barnes' right hand. Moreover, Barnes argues that the video does support Mingura's testimony because Mingura only ever said, "he *tried* grabbing my balls," did not react in pain, and continued to calmly state "let go" even when Barnes' right arm was fully controlled. (Doc. 103 at 22 (emphasis added).) Barnes asserts that a reasonable juror viewing the video could "conclude that Mingura falsely accused [Barnes], in order to make others believe that he was justified in punching [Barnes] in the face. The fact that Mingura began smashing [Barnes's] face into the floor before alleging that [he] had grabbed his testicles reveals that Mingura had already been intent on violently hurting [Barnes]." (*Id.*) This is a credibility dispute to be resolved by a jury. Viewing the evidence in a light most favorable to Barnes, as the Court must, a reasonable jury could find that Barnes did not pose a threat to the four deputies.[16] This factor weighs in Barnes' favor.

Similarly, the issue of whether Barnes was actively resisting is partially. Barnes did passively resist an order to stand up out of his chair when he was told he was under arrest. When a suspect's only resistance is failure to comply with a police order, and when that resistance is "not particularly bellicose," it is considered passive and does not weigh heavily in the government's favor. *Bryan v. MacPherson*, 630 F.3d 805, 830 (9th Cir. 2010) (citing *Forrester v. City of San Diego*, 25 F.3d 804, 805 (9th Cir. 1994); *see also Smith*, 394 F.3d at 703. It is disputed, however, whether Barnes resisted the deputies when pinned to the ground. He testified that he did not actively resist while on his stomach, and asserts that any movement on the video is only the result of pain inflicted by Mingura while the three deputies had control of his body. (Doc. 103 at 22.) Accepting the contention that Barnes did not resist on the floor and his only resistance was passive, this factor weighs

---

[16] Mingura also asserts that the deputies faced a threat due to Barnes' daughter's interference and commands to the dog. The daughter and the dog's actions (or inaction) are irrelevant to the Fourth Amendment consideration of whether Barnes himself posed a threat to the deputies.

slightly in Mingura's favor.

Finally, the Court must consider whether Mingura's use of force was necessary. Mingura alleges that forcing Barnes' face to the floor repeatedly was an attempt to "gain control over Plaintiff's upper body" while Barnes "aggressively resisted deputies' attempts to restrain his hands." (Doc. 95 at 10–11.) Yet the video shows that Mingura did not attempt to grasp or control Barnes' right arm, which was flat on the floor near Mingura's legs, before Mingura used two hands to repeatedly slam Barnes' face against the metal grate on the floor. Nor, on the video, does it appear that Mingura lacked control over Barnes' upper body—he had a knee on his back, and two hands on the back of his head, while two other deputies assisted. In these circumstances, a reasonable juror could conclude that hitting Barnes' face against the floor was unnecessary. (Doc. 95 at 13.)

Similarly, although Mingura asserts that it was only after Barnes grabbed his testicles and refused commands to let go that Mingura delivered a closed-fist strike to Barnes' head, the video shows that Mingura struck Barnes in the face *before* he stated that Barnes had tried to grab his testicles, and Mingura continued to repeat "let go," even when Barnes' right arm was pulled behind his back. As discussed above, it is disputed whether Barnes ever attempted to touch Mingura's testicles. As a result, a reasonable juror could conclude that Mingura's fist strike was unnecessary.

In sum, under the totality of the circumstances, and viewing the facts in the light most favorable to Barnes, the Court cannot conclude as a matter of law that the governmental interests outlined in the *Graham* factors justify the nature and extent of force which Mingura inflicted upon Barnes. As a result, the Court will deny summary judgment on Mingura's claim that his force was objectively reasonable.

### III.   Material Factual Disputes Preclude Qualified Immunity

A defendant in a § 1983 action is entitled to qualified immunity from damages for civil liability if his conduct does not violate clearly established federal statutory or constitutional rights of which a reasonable person would have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The qualified immunity analysis requires the court

to make two distinct inquires, the "constitutional inquiry" and the "qualified immunity inquiry." *See Estate of Ford v. Ramirez-Palmer*, 301 F.3d 1043, 1049 (9th Cir. 2002).

The constitutional inquiry asks whether, when taken in the light most favorable to the non-moving party, the facts alleged show that the official's conduct violated a constitutional right. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). Mingura argues that he did not violate Barnes' constitutional rights because his use of force was objectively reasonable. (Doc. 95 at 16.) The Court has determined, for the purposes of summary judgment, that Barnes has demonstrated sufficient facts from which a reasonable jury could conclude that Mingura violated Barnes' constitutional rights because, once on the floor, Barnes did not pose a threat to the deputies or resist arrest.

The qualified immunity inquiry asks if the right was clearly established at the relevant time, and "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Saucier*, 533 U.S. at 201–02. A clearly established right is one that is "sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Mullenix v. Luna*, 577 U.S. 7, 11 (2015). "Sufficiently clear" does not mean a prior case with identical facts is required, but the Supreme Court has recognized that specificity is important in the Fourth Amendment context because whether an officer has used excessive force depends on the facts and circumstances of each particular case. *Rivas-Villegas v. Cortesluna*, 142 S. Ct. 4, 8 (2021).

The plaintiff has the burden to show that the right was clearly established at the time of the alleged violation. *Sorrels v. McKee*, 290 F.3d 965, 969 (9th Cir. 2002); *Romero v. Kitsap County*, 931 F.2d 624, 627 (9th Cir. 1991). Therefore, regardless of whether the constitutional violation occurred, the officer should prevail if the plaintiff cannot show the right was "clearly established" or the officer could have reasonably believed that his particular conduct was lawful. *Romero*, 931 F.2d at 627. When the officer's conduct is subject to a material factual dispute—such as when the officer's version of events is materially contradicted by the record or turns on credibility—the court is precluded from granting summary judgment in favor of the officer on the issue of qualified immunity.

*Smith v. Agdeppa*, 56 F.4th 1193, 1203 (9th Cir. 2022) (citing *Newmaker v. City of Fortuna*, 842 F.3d 1108, 1116 (9th Cir. 2016)). Such is the case here.

Barnes argues that Mingura is not entitled to qualified immunity because it was clearly established at the time that the use of excessive force against arrestees was unconstitutional. (Doc. 103 at 23.)  Barnes cites *Lalonde v. County of Riverside*, 204 F.3d 947 (9th Cir. 2000); *Drummond v. City of Anaheim*, 343 F.3d 1052 (9th Cir 2003); and *Lowry v. City of San Diego*, 858 F.3d 1248 (9th Cir. 2017), in support.[17] Citing *Meredith v. Erath*, 342 F.3d 1057 (9th Cir. 2003), Barnes further asserts that it was clearly established that "smashing a suspect's fact into the floor and punching the suspect" constitutes disproportionate and excessive force when "the alleged crimes were relatively benign, the suspect posed no immediate threat to the officer, and the suspect's resistance was fairly passive." (Doc. 103 at 27.)[18] Barnes argues that the rationale of *Lowry* and *Meredith* would have put any reasonable officer on notice that the degree of force used by Mingura was excessive and unnecessary. (Doc. 103 at 27.) Barnes does not dispute that—because he passively resisted arrest but did not fight the deputies on the floor—Mingura would have

---

[17] *Lalonde* examined an officer's use of pepper spray and explained that "in a situation in which an arrestee surrenders and is rendered helpless, any reasonable officer would know that a continued use of the weapon or a refusal without cause to alleviate its harmful effects constitutes excessive force." 204 F.3d at 961. In *Drummond*, the panel denied qualified immunity, finding there was no need for a "federal case directly on point to establish that kneeling on the back and neck of a compliant detainee, and pressing the weight of two officers' bodies on him even after he complained that he was choking and in need of air violates clearly established law, and that reasonable officers would have been aware that such was the case." 343 F.3d at 1060, 1062 (explaining that an arrestee's "basic constitutional right to be free from excessive force was clearly established as of 1999."). Finally, in *Lowry* the en banc Ninth Circuit declared that "although we have acknowledged that even purely passive resistance can support the use of some force, . . . our cases suggest that where the suspect passively resists arrest, a lesser degree of force is justified compared to situations in which the suspect actively resists arrest." 858 F.3d at 1248 (cleaned up). The *Lowry* opinion was filed on June 6, 2017, prior to the incident at issue in this case.

[18] In *Meredith*, an IRS agent encountered a "vociferously" objecting and passively resisting suspect, forcibly threw the woman to the ground, and twisted her arms before handcuffing her. 342 F.3d at 1061. The court found that the agent's conduct was objectively unreasonable because the need for force was "minimal at best." *Id.*

been justified in using a proportional amount of force to control Barnes' right arm to pull it behind his back, or even hold him down against the floor. (*Id.* at 26.) But Barnes argues that Mingura "certainly was not justified in smashing [Barnes'] face onto the floor or punching his face," because the deputies had already subdued him. (*Id.* at 26–27.) The Court agrees that Barnes has made a sufficient showing that it was clearly established prior to the incident that, when an arrestee's resistance is fairly passive and the need for force is minimal, slamming the arrestee to the ground and inflicting pain prior to handcuffing is excessive and unconstitutional.

The Court rejects Mingura's argument that no case law "with the same facts" put him on notice that striking Barnes in the head and hitting his face against the floor was unlawful under the circumstances (Doc. 95 at 17.) A defendant is not entitled to qualified immunity simply because "the very action in question has not previously been held unlawful." *Sandoval v. County of San Diego*, 985 F.3d 657, 680 (9th Cir. 2021); *Hope v. Pelzer*, 536 U.S. 730, 741 (2002) ("[O]fficials can still be on notice that their conduct violates established law even in novel factual circumstances.") Moreover, Mingura relies on a disputed version of the November 16, 2017 incident to make the case that he is entitled to qualified immunity.

Mingura asserts that the Ninth Circuit has established that head slams are not unreasonable when a suspect refuses commands and resists arrest. (Doc. 95 at 17 (citing *Ames v. King County*, 846 F.3d 340, 350 (9th Cir. 2017).)[19]  Mingura also asserts that fist strikes are permissible following active resistance and direct assault on an officer. (*Id.*

---

[19] In *Ames,* a deputy responding to an attempted suicide call pulled a woman by her hair out of a truck containing her unconscious son and slammed her head into the ground three times when the woman refused to comply with orders to provide her arm for handcuffing. 846 F.3d at 345. The Ninth Circuit panel concluded that the deputy's use of force while "discharging her community caretaking function" was objectively reasonable in light of the unfolding emergency because the deputy needed to "quickly disable the clearly panicked mother from leaving with her gravely ill son." *Id.* at 351. *Ames* is inapposite to the situation here. Viewing the record in the light most favorable to Barnes, Mingura faced no ongoing emergency that could have justified the level of force he employed. (*Id.*

(citing *Tuuamalemalo v. Greene*, 946 F.3d 471 (9th Cir. 2019).)[20] Barnes denies that he actively resisted because he did not struggle against the deputies or touch Mingura's testicles. (*Id.*) The Court has already determined that these factual issues turn on credibility disputes that must be resolved by a jury. Because the disputed facts are material to the question of what an officer in Mingura's position might have reasonably believed during the incident, the Court is precluded from awarding qualified immunity to Mingura.

### IV.   *Monell* Liability

In Count Two, Barnes brings a § 1983 claim against Sheriff Preston Allred in his official capacity, alleging that Allred and his administrative staff violated Barnes' Fourth and Fourteenth Amendment rights by implementing and maintaining policies and procedures, as well as tolerating practices, which allowed and implicitly encouraged Mingura's use of excessive force against Barnes. (Doc. 11 ¶ 22.) Barnes also alleges that Allred failed to establish and implement policies, procedures, and practices which would have deterred or prevented Mingura's use of excessive force against him. (*Id.* ¶ 23.) In particular, Barnes challenges the GCSO's failure to adequately screen Mingura prior to hiring, failure to provide use of force training, and failure to discipline Mingura after the November 3 incident. Allred moves for summary judgment on all claims against him, arguing that there is no evidence to support *Monell* liability because Barnes has not disclosed a police procedures expert and there is no "policy, custom, or practice that

---

[20] Mingura cites *Tuuamalemalo* for the proposition that "other circuits also recognize that punching a suspect in self-defense to make an arrest is not necessarily unconstitutional." Yet that phrase only appears in the slip copy of the district court order and is not clearly established law. *See Tuuamalemalo v. Las Vegas Metro. Police Dep't,* No. 216CV00619JADVCF, 2018 WL 11016234, at *7 (D. Nev. Mar. 27, 2018). In fact, the Ninth Circuit denied qualified immunity for the officer's use of a chokehold in *Tuuamalemalo* and remanded the case because the plaintiff disputed that he resisted and "there was little chance he could initiate resistance with five other officers fully restraining him and pinning him to the ground." 946 F.3d at 477. Here as well the Court must view the facts in the light most favorable to Barnes, who asserts that he was not and could not have been actively resisting with three deputies pinning him to the ground when Mingura used force. *See id.* at 478. Because Mingura faced no similar need for self-defense, *Tuuamalemalo* is not relevant here.

encourages or allows GCSO deputies to use excessive force." (Doc. 92 at 7–8.)

Sheriff Allred may not be sued under § 1983 solely because an injury was inflicted by one of his deputies. *Long v. County of Los Angeles,* 442 F.3d 1178, 1186 (9th Cir. 2006). A municipal or county entity may be held liable under § 1983 only when execution of its policy or custom inflicts the injury. *Id.* (citing *Monell,* 436 US. at 690–94); *Jackson v. Barnes*, 749 F.3d 755, 764 (9th Cir. 2014). Thus, to succeed on a *Monell* claim against Allred, Barnes must show that Mingura deprived him of a constitutional right and the Graham County Sheriff's Office has a policy or custom that led to the deprivation. *Monell,* 436 U.S. at 694; *Gillette v. Delmore,* 979 F.2d 1342 (*Monell* liability may be established by proving that a municipal employee "committed the alleged constitutional violation pursuant to a formal governmental policy or a longstanding practice or custom which constitutes the standard operating procedure of the local governmental entity.") (internal quotations omitted). To establish *Monell* liability on the theory that a facially lawful municipal action has led an employee to violate a plaintiff's rights, the plaintiff must demonstrate that the action was taken with deliberate indifference to its known or obvious consequences. *Bd. of Cnty. Comm'rs of Bryan Cnty., Okla. v. Brown*, 520 U.S. 397, 407 (1997). The Court has determined that Barnes has established a constitutional deprivation for the purposes of summary judgment.

### A. Lack of Expert

Allred argues that Barnes' failure to retain a police procedures expert is fatal to his *Monell* claim because "expert testimony is necessary to prove professional malfeasance." (Doc. 92 at 6.) Allred asserts that Barnes' claims regarding Mingura's hiring, training, and discipline do not present circumstances "so obvious that expert testimony is unnecessary." (*Id.* at 7.) In support, Allred cites to three Arizona medical malpractice cases requiring an expert to establish a physician's negligence. (*Id.*) These state law cases are inapposite because they do not involve the operations of a Sheriff's department or analyze § 1983 claims.

A plaintiff may survive summary judgment on a *Monell* claim without having

identified an expert if there is other supporting evidence. *See Meli v. City of Burlington, Vermont*, 585 F. Supp. 3d 615, 643 (noting the Second Circuit has upheld several *Monell* claim verdicts without the use of expert testimony related to city or department policies). Here, Barnes presents evidence that Allred failed to adequately investigate evidence that Mingura had routinely used excessive force on detainees in his past employment, did not receive use of force training even upon request, and did not restrict Mingura's duties after the first incident at the Barnes residence. These facts, if proven, and the reasonableness of the actions, is within a lay juror's common understanding. Notably, Allred's proffered police expert does not appear to offer any opinions regarding the propriety of GCSO's policies, procedures, or practices. (*See* Doc. 93-4.) In sum, Barnes' decision not to obtain expert opinions is not in and of itself a reason to grant summary judgment on the *Monell* claim.

### B.  Failure to Screen

Barnes alleges that Allred and his administrative staff violated his constitutional rights by hiring Mingura as a GCSO deputy without reasonably investigating or adequately determining his propensity for using excessive force against arrestees. (Doc 11 ¶ 24.) Allred argues that there is no evidence of deliberate indifference in the GCSO hiring process because "Mingura received stringent vetting." (Doc. 92 at 9.) Allred argues that summary judgment is appropriate on GCSO's failure to screen Mingura because there is no evidence "from the information gathered in the hiring process" that would have shown it was "plainly obvious" that Mingura would use excessive force if hired. (Doc. 92.) Allred misconstrues Barnes' failure to screen argument.

Barnes asserts that because Mingura disclosed that he had been both investigated by DPS and charged by the State of Arizona for the use of excessive force as a police officer, it was deliberately indifferent for Chief McCormies and Lieutenant Nelson to fail to obtain the DPS report and investigate the charges, rather than simply concluding that he was satisfactory to hire based on the information already collected. (*Id.* at 3.) Barnes alleges that it was the failure to apply adequate scrutiny to Mingura's background that violated his

constitutional rights, because if GCSO had properly screened Mingura it would have reviewed the DPS excessive force report and investigated the aggravated assault charges that made it plainly obvious Mingura had a propensity for routinely inflicting excessive force on arrestees. (Doc. 127 at 2.)  A municipality may be liable for a failure to properly screen in the hiring process if it is deliberately indifferent to the fact that the people it is hiring were the kind of people who would predictably commit this type of constitutional violation. *Brown*, 520 U.S. at 411 ("Only where adequate scrutiny of an applicant's background would lead a reasonable policymaker to conclude that the plainly obvious consequence of the decision to hire the applicant would be the deprivation of a third party's federally protected right can the official's failure to adequately scrutinize the applicant's background constitute 'deliberate indifference.'").  Thus, the fact that GCSO hiring policies were followed in Mingura's application and background process, (Doc. 129 at 2), is irrelevant if GCSO was deliberately indifferent to and did not reasonably consider the information it obtained during that process.[21]

It is undisputed that GCSO policies led to the hiring of Mingura. A reasonable juror could conclude that—had the GCSO applied adequate scrutiny to Mingura's disclosures—it would have been plainly obvious that Mingura had both a reputation and a propensity for using excessive force and would predictably continue to use excessive force against arrestees if hired. Because Barnes has presented sufficient evidence to conclude that those

---

[21] The jury should evaluate Allred's explanation that the criminal charges were not investigated because they had been dismissed. A jury could conclude that, if the GCSO had followed up, McCormies and Nelson likely would have learned that the aggravated assault charges arising out of Mingura's use of allegedly excessive force against three arrestees had only been dismissed due to lack of cooperation from the victims. Also, Allred does not offer an explanation for the GCSO's decision not to obtain the DPS report on Mingura. McCormies testified that, at the time, GCSO did not have a practice of following up on any negative comments they received from an applicant's prior employers. (*Id.* at 11; *see* Doc. 126-8 at 3–4.) As detailed earlier in this order, the 2012 DPS investigation included interviews with Mingura's fellow officers at the Greenlee County Sheriff's Office and Clifton Police Department, as well as several individuals who had experienced Mingura's allegedly excessive force during arrests. (*See also* Doc. 126 ¶ 37 (quoting 126-1 at 88).)

1   policies were the moving force behind the alleged deprivation of his constitutional rights,

2   the Court will deny summary judgment on the failure to screen aspect of Barnes' *Monell*

3   claim.

### C. Failure to Train

5   Barnes next alleges that Allred and his office failed to adequately train and supervise

6   Mingura, contributing to the use of excessive force against him on November 16, 2017,

7   because Mingura specifically requested use of force training but GCSO did not provide it.

8   (Doc. 11 ¶ 24; Doc. 127 at 12.)

9   *Monell* liability can attach where the failure to train an employee reflects a deliberate

10  or conscious choice by the municipality that demonstrates deliberate indifference to the

11  person whose rights were violated. *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388

12  (1989). Again, deliberate difference is "a stringent standard of fault, requiring proof that a

13  municipal actor disregarded a known or obvious consequence of his action." *Brown*, 520

14  U.S. at 410. To establish deliberate indifference for failure to train, the plaintiff must

15  present evidence of a "program-wide inadequacy in training," beyond a shortfall in a single

16  officer's training. *Blankenhorn v. City of Orange*, 485 F.3d 463, 484–85 (9th Cir. 2007).

17  Allred argues that Barnes cannot show there was a program-wide inadequacy in

18  training because he "has no expert to testify that Mingura's AZPOST academy training is

19  inadequate or that GCSO training is deficient." (Doc. 92 at 10–11.) The Court has

20  explained why the lack of an expert is not fatal to Barnes' claims. Mingura's academy

21  training was in 2007, a decade before the events giving rise to this case, and Mingura

22  testified that GCSO's field training program upon hiring did not involve use of force

23  instruction. Allred does not address Mingura's testimony that he had specifically requested

24  use of force training from Lieutenant Nelson and GCSO's use of force instructor but was

25  told there was no time to do it that year, or the fact that there were no use of force

26  presentations offered in 2016 or 2017 while Mingura was with the GCSO. (*See* Doc. 127

27  at 12–13.) Allred presents no argument why GCSO's reliance on its deputies' academy

28  training—especially when more training was requested, and in light of the information that

GCSO did receive in Mingura's hiring process—cannot be considered a program-wide inadequacy in training that could have led to unconstitutional uses of force. Accordingly, the Court will deny summary judgment on failure to train aspect of Barnes' *Monell* claim.

### D. Failure to Discipline

Finally, Barnes alleges that Allred and his office failed to adequately discipline Mingura and promptly terminate him for his conduct on November 3, 2017. (Doc. 11 ¶ 24.) Barnes alleges that these failures established a climate of tolerance for the use of excessive force and implicitly encouraged Mingura to again use unlawful force against him on November 16, 2017. (*Id.*) Barnes does not allege that Allred ratified Mingura's November 3 or November 16 uses of force, but argues that Chief McCormies should have immediately placed Mingura on leave while the November 3 excessive force allegations were being investigated. (Doc. 126 at 22.) In the days following the November 3 incident, Chief McCormies first sought to have an independent law enforcement agency investigate because of DPS delays, but ultimately a request for DPS to investigate was made on November 30, 2017. Mingura was placed on paid administrative leave on December 7, 2017 and did not return to duty prior to his termination.

To establish *Monell* liability based on a failure to discipline, Barnes must show that a policy, custom, or practice of failing to discipline Mingura amounted to deliberate indifference. *Harris*, 489 U.S. at 388–89. A municipality can be liable for an isolated constitutional violation if the final policymaker ratified a subordinate's actions. *Christie v. Iopa*, 176 F.3d 1231, 1238 (9th Cir. 1999). A mere failure to overrule a subordinate's actions, without more, is insufficient—to find ratification, there must be something more than a single failure to discipline. *Lytle v. Carl*, 382 F.3d 978, 987 (9th Cir. 2004).

Barnes does not allege facts demonstrating that there was a policy, custom, or practice of failing to investigate or discipline GCSO deputies. His only evidence for the failure to discipline is Allred's allegedly delayed response to the single November 3 incident. This is insufficient to establish *Monell* liability. Thus, the Court will grant summary judgment on the failure to discipline and improper retention aspects of Barnes'

*Monell* claim.

## CONCLUSION

For the foregoing reasons, **IT IS ORDERED:**

1.  Defendant Mingura's Motion for Summary Judgment (Doc. 95) is **DENIED**.

2.  Defendant Allred's Motion for Summary Judgment (Doc. 92) is **DENIED** in part and **GRANTED** in part.

3.  A telephonic Pretrial Hearing is set for **Thursday, August 10, 2023**, **at 2:30 p.m.** The parties will receive a notification with call-in instructions prior to the Pretrial Hearing. The parties shall be prepared to discuss the setting of a trial date.

4.  The parties' Joint Proposed Pretrial Order is due **30 days** from the date of this Order. The Court's Joint Proposed Pretrial Order form can be found at: https://perma.cc/SK55-JKK4.

Dated this 25th day of July, 2023.

_____
Honorable Jennifer G. Zipps
United States District Judge